# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES LANNELL BOYD | * | |
| Plaintiff | * | |
| v | * | Civil Action No. DKC-10-3187 |
| WARDEN K. HORNING, *et al.* | * | |
| Defendants | * | |

***

## **MEMORANDUM OPINION**

Pending are Defendants' Motions to Dismiss or for Summary Judgment. ECF No. 17 and 18. Although he was advised of his right to file a response in opposition to Defendants' motions and of the consequences of failing to do so, Plaintiff has not filed anything further in this case. *See* ECF No. 19. Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

### **Background**

On June 15, 2009, Plaintiff, who was incarcerated at the Maryland Correctional Training Center (MCTC), was seated on a bench watching a softball game. ECF No. 1 at p. 7. The bench was positioned behind the batter and was not protected by a fence. The batter in the game threw the aluminum bat behind him after hitting the ball, striking Plaintiff in the face, knocking him to the ground, and rendering him unconscious. *Id*.; ECF No. 3 at p. 2.

Plaintiff states that several inmates began trying to keep him alert by pouring water on his wrist and in his naval. He claims he could not speak at the time, but could hear everything that occurred. Several minutes after he was struck, Plaintiff was moved onto a John Deere Gator[1] so

---

[1] The Gator is a motorized cart used to transport inmates to the medical unit or "dispensary." ECF No. 17 at p.9, fn. 4.

he could be transported to the dispensary. Plaintiff alleges that he was positioned on the back of the vehicle with his head near a pole. He claims that the ride to the infirmary was bumpy, causing him to move around, striking his head on the pole. Plaintiff states that the entire time he was on the Gator his head was never in a secure, stable position. ECF No. 1 at p. 7.

Upon arriving at the dispensary, Plaintiff was moved onto a gurney. He states he heard Dr. Joubert tell the nurse that his head needed to be stabilized. Despite the doctor's statement, nothing occurred to stabilize Plaintiff's head until the ambulance workers arrived to take him to Washington County Hospital. At the hospital Plaintiff learned that he had multiple fractures in his face which required reconstructive plastic surgery. Plaintiff was admitted to the hospital from June 15, 2009 through June 20, 2009. Upon discharge, Plaintiff was transferred to the prison hospital at Maryland Correctional Institution at Hagerstown (MCIH) where he remained until June 23, 2009. ECF No. 1 at p. 7.

Plaintiff claims that when he was rendered unresponsive by the blow to his face, medical staff should have been summoned to the softball field where he could be medically assessed without being moved. Plaintiff further claims that permitting other inmates, who are not medically trained, to move him onto the Gator caused him further injury as his face was allowed to hit the pole several times during the ride. He states it was only after inmate Tibbs placed his hand on the side of his head that he felt slightly secure during the transport. ECF No. 1 at pp. 7 – 9. Plaintiff also claims that he was supposed to receive a follow-up consultation with Dr. Herrea, a plastic surgeon, one week following his discharge from Washington County Hospital, but he was not seen. *Id*. at p. 8.

With respect to correctional staff, Plaintiff alleges that Warden Horning was told that the bench was too close to the playing field and was asked if the bench could be moved prior to

2

Plaintiff's injury. He states Officer Monk allowed inmates improperly to place him on the Gator which contributed to the seriousness of his facial fractures. Additionally, Plaintiff states that Monk never wrote in his report that Plaintiff sustained a blunt force trauma to the head. ECF No. 1 at p. 9.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Exhaustion of Administrative Remedies

The PLRA provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions. It is of no consequence that Plaintiff is aggrieved by a single occurrence, as opposed to a general conditions of confinement claim. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this Court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

## Analysis

Plaintiff named six defendants in his complaint: Warden D. Kenneth Horning and CO II B. Monk,[2] as well as medical providers Dr. Ava Joubert-Curtis, Nurse Wanda Diaz, Nurse Cynthia Rounds, and Cheryl Bennett, HSA. With respect to Plaintiff's claims regarding the procedures followed to transport him to the dispensary and the safety of the softball field, Horning claims Plaintiff failed to exhaust those claims through the Administrative Remedy

---

[2] Correctional Officer Monk, who was the officer present on the softball field when the accident occurred, was named as a Defendant in the Complaint, but was never served.

4

Procedure (ARP). ECF No. 18 at Ex. 4 – 7. Plaintiff does not dispute the allegation. Horning is accordingly entitled to summary judgment in his favor.

Defendant Warden Horning provides the serious incident report documenting the accident. ECF No. 18 at Ex. 2. A report prepared by Officer Monk, who was present on the field when Plaintiff was injured, states the incident occurred at approximately 5:30 pm. *Id.* at p. 6. Monk explains that after the bat struck Plaintiff in the face, knocking him to the ground, he checked to make sure Plaintiff was breathing and called for the Gator to transport him to the dispensary. *Id.* Monk also states that Plaintiff was strapped to a backboard and loaded onto the vehicle. *Id.* Monk's actions in supervising Plaintiff's placement on the backboard and transporting him to the dispensary evidenced an appreciation of the urgency required by Plaintiff's serious facial injury. There is no evidence that Monk's decision to transport Plaintiff in this manner contributed in any way to his injuries.

The claim against Monk is without merit. This court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humpreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)). The undisputed evidence with respect to the unserved Defendant is such that a fair-minded jury could not return a verdict in favor of Plaintiff on this claim. *See Anderson v. Liberty Lobby*, 477 U.S. at 252 (1986). Inasmuch as the court's analysis relies on matters outside the scope of the pleadings, summary judgment shall be entered in favor of Defendant Monk. *See* Fed. R. Civ. P. 12(b)(6).

A report prepared by Officer Rummel states that Plaintiff was in the dispensary at approximately 5:30 pm, receiving treatment for his facial injuries. ECF No. 18 at Ex. 2, pp. 2 – 4. Rummel states that Dr. Joubert called for an ambulance to take Plaintiff to Washington

County Hospital; that it arrived at 5:40 pm; and it left MCTC at approximately 5:55 pm. *Id.* at p. 4. Plaintiff was escorted by two officers from MCTC, Deneen and Scrugham. *Id.* at p. 9.

Affidavits and medical records submitted by Defendants Joubert-Curtis, Diaz, Rounds, and Bennett (hereinafter, Medical Defendants), establish that when Plaintiff arrived at the MCTC dispensary via the Gator, he was on a backboard which was equipped with two rigid foam supports at both sides of Plaintiff's head. The purpose of the foam supports is to stabilize the head and neck during transport. Plaintiff remained on the backboard until he was transported to the hospital. ECF No. 17 at Ex. B.

While Plaintiff was in the medical unit at MCTC he was evaluated by Defendant Wanda Diaz, a registered nurse, who states Plaintiff was unresponsive upon arrival. Diaz observed a laceration under Plaintiff's left eye, redness and swelling at the bridge of his nose, and bleeding from his nostrils. Diaz cleaned Plaintiff's nose and eye lacerations with saline solution. ECF No. 17 at Ex. B. When Dr. Joubert-Curtis assessed Plaintiff he was conscious but drowsy and able to move his arms and legs and follow commands. *Id.* at Ex. A.

After brief initial treatment at MCTC, Plaintiff was transported to the emergency room via ambulance to Washington County Hospital, where he was later admitted. ECF No. 17 at Ex. C, pp. 5—9. A CT scan of Plaintiff's facial injury revealed he had suffered numerous comminuted fractures[3] to the left side of his face which involved his cheekbone, his nose, and the bones in his eyesocket.[4] *Id.* at p. 11. Plaintiff was scheduled for surgical repair[5] of the fractures,

---

[3] A comminuted fracture is one where the bone is broken, splintered, or crushed into a number of pieces. ECF No. 17 at p. 10, fn.6.

[4] Specifically, the CT scan showed: "(1) a blowout fracture of his left orbit with a depressed fracture to the floor of the orbit; (2) a severely comminuted fracture of his left maxillary sinus, involving all walls of the sinus with depression of the fracture fragments; and (3) fracturs of his nasal and septal (center of the nose) bones." ECF No. 17 at Ex. A.

including implantation of a titanium plate, on June 17, 2009. In the interim, Plaintiff received morphine for pain management. *Id*. at pp. 11 –16. Plaintiff was discharged from Washington County Hospital on June 18, 2009, and was transferred to the Maryland Correctional Institution at Hagerstown (MCIH) infirmary. *Id*. at pp. 17 – 21. Plaintiff was discharged from the MCIH infirmary on June 22, 2009. *Id*. at p. 26. He was provided with a three-day supply of Tylenol-codeine No. 3 at the time of his discharge. *Id*. On June 24, 2009, when Plaintiff complained of pain, he was prescribed Ultram, a narcotic strength pain-reliever, and Tylenol-codeine No. 3 through July 1, 2009. ECF No. 17 at Ex. C, p. 29.

Although Plaintiff claims he was not provided with proper medical care following his discharge, medical records indicate that he was evaluated by medical staff for complaints of continued facial pain for which he was prescribed Ultram, Tylenol-codeine No. 3, and Elavil. ECF No. 18 at Ex. 3, pp. 128, 143, 158, 179, 243, and 247.[6] In addition, Plaintiff received follow-up appointments with Dr. Herrara. He returned to see Dr. Herrara at Washington County Hospital on August 3, 2009, when it was noted that Plaintiff was experiencing numbness and pain to his lower eyelid. ECF No. 17 at Ex. C, p. 31. Plaintiff was instructed to massage the lower eyelid and return in three months for another follow-up. *Id*. He was seen again by Dr. Herrara on September 9, 2009, when it was noted that he was "healing well". ECF No. 18 at Ex. 3, p. 56. On January 17, 2010, Plaintiff's face was x-rayed and it was noted that all post-operative changes were intact, with no acute abnormality seen. *Id*. at p. 35.

On February 24, 2010, Plaintiff requested another evaluation by Dr. Herrara. *Id*. at pp. 35 – 36. At that time, it was noted that Plaintiff had a depression below his left orbital area, but

---

[5] Dr. Aryeh Herrera, a plastic surgeon, performed the surgery on Plaintiff's face on June 17, 2009. ECF No. 17 at Ex. A.

[6] Page numbers reference ECF page numbers.

7

it was not interfering with his vision or blinking. *Id*. Because there was no medical reason for plastic surgery at that time, Plaintiff was not referred to the plastic surgeon, but he was again provided Ultram for pain. *Id*. at p. 37. On December 1, 2010, a request was made to have Plaintiff transferred from a Jessup correctional facility to MCTC to accommodate an appointment with Dr. Herrara. ECF No. 17 at Ex. C, p. 46 and 47. Plaintiff had developed a chronic pain condition as a result of the injury to his face; noted therapies that were tried without success, included the use of pain medications such as Ultram, Neurontin, Tylenol-codeine No. 3, and Elavil. *Id*. at pp. 44 – 45. Plaintiff was again evaluated on December 16, 2010, by Dr. Herrera, who prescribed a course of neuroleptics, including Neurontin and Elavil, to manage Plaintiff's pain. *Id*. at p. 49 and 50.

On January 6, 2011, Plaintiff withdrew a sick call request regarding continued pain, after he was informed he needed to stay on the prescribed medications for two to three weeks and return if there was no improvement. *Id*. at p. 51. In February 2011, Plaintiff's Neurontin prescription was increased to 600 mg when he complained of continued pain. *id*. at pp. 52—53. Plaintiff's request to return to see the plastic surgeon was deferred at the time due to the length of time that had passed since the surgery and because his chief complaint was pain, which was being managed by medications administered at the prison. *Id*. at p. 54.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the

defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839- 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

There can be no doubt that Plaintiff's injury was a serious one requiring both emergency as well as long-term follow-up medical care. *See* ECF No. 3 at p. 1. The response by both correctional and medical staff following the accident was swift, reflecting an appreciation for the seriousness of Plaintiff's painful injury. Plaintiff's allegation that he was not provided with adequate follow-up care is belied by the record evidence which he fails to dispute. Plaintiff was seen by the plastic surgeon after his discharge from the hospital on three occasions. In addition, pain medication was provided to Plaintiff on a number of occasions in an effort to address his chronic pain. There is no evidence that Plaintiff's complaints of pain were ignored. To the extent that medical intervention did not alleviate all of Plaintiff's pain, that failure does not reflect a callous disregard for Plaintiff's condition. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849(4th Cir.1985), *citing Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir.1970). The Medical Defendants are entitled to summary judgment in their favor.

A separate Order follows.


Date:   June 1, 2011                          /s/
                                              DEBORAH K. CHASANOW
                                              United States District Judge